Mark Aussieker
8830 Olive Ranch Lane
Fair Oaks, CA 95628
Phone: 916-705-8006
aussieker1@gmail.com

***in pro per***

FILED

JAN 12 2024

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

MARK AUSSIEKER,

Plaintiff,

v.

CONSULTME LLC, LAWRENCE
KRAKOW, T & T TRUCK
SERVICES LLC, ROBIN MEADOWS
Defendant(s)

:

No. 2: 24-CV-00149-DJC-DB (PS)

**COMPLAINT FOR DAMAGES**
Trial by Jury not requested

1.      Plaintiff Mark Aussieker ("Plaintiff" or "Mr. Aussieker") brings this action to enforce the consumer-privacy provisions of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, a federal statute enacted in 1991 in response to widespread public outrage about the proliferation of intrusive, nuisance telemarketing practices. *See Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740, 745 (2012).

2.      The Defendants have placed telemarketing calls to a telephone number Mr. Aussieker owned without consent. Its not possible to "police" the estimated 60 billion robocalls made every year. The FCC Has Fined Robocallers $208 Million and It's Collected $6,7901.

3.      This Complaint also relates to the Defendants making telemarketing calls to individuals in the absence of any "do not call" policy or training, as well as making such calls

---

[1] https://www.wsj.com/articles/the-fcc-has-fined-robocallers-208-million-its-collected-6-790-11553770803

1

to individuals who previously indicated that they did not want to receive telemarketing calls when they registered their number on the national do not call registry.

## PARTIES

4.      Plaintiff Mark Aussieker is an individual and resident of the state of California, and this District.

5.      Defendant Consultme LLC ("Consultme") is a Florida LLC. Consultme is a "person" as defined by 47 US.C. § 153 (39).

6.      Defendant T & T TRUCK SERVICES, LLC ("T & T") is a Florida LLC. T & T is a "person" as defined by 47 US.C. § 153 (39).

7.      T & T and Consultme send funds from their merchant account and these people will be referred to as "AGENTS".

8.      Defendant LAWRENCE KRAKOW ("KRAKOW") is a natural person and will be referred to as KRAKOW. He is believed to be the head of an unknown business association that is referred to as "AGENTS".

9.      Defendant ROBIN MEADOWS ("ROBIN") is a natural person and will be referred to as ROBIN.

## Jurisdiction & Venue

10.      The Court has federal question subject matter jurisdiction over these TCPA claims. Mims v. Arrow Financial Services, LLC, 132 S. Ct. 740 (2012).

11.      Venue is proper pursuant to 28 U.S.C. § 1391 (b)(2) because the Plaintiff is a resident of this district, which is where he received the illegal telemarketing calls that are the subject of this lawsuit.

12.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred within this District.

13.      This Court has personal jurisdiction over the parties because Defendants called into the forum state by targeting a phone number in that forum and targeted the plaintiff. Likewise, Plaintiff's rights were violated in the State of California and his claims arose out of his contact with Defendants. CONSULTME LLC and T & T TRUCK SERVICES LLC performed payment processor services by and through, ROBIN MEADOWS who knew that PLAINTIFF was in California.

14.      Plaintiff believes that DEFENDANTS had actual notice that he was a California resident because his phone number corresponds to a California area code.

15.      Plaintiff believes that DEFENDANTS had actual notice that he was a California resident because he supplied his address prior to make a purchase which gave notice that he was a California resident.

16.      Plaintiff was called and pitched debt relief services. Plaintiff gave his credit card over the phone to purchase a $3,800. T and T ConsultMe agreed to have sales made though their AGENTS.

17.      T and T Consult Me each set up a merchant account to accept Visa credit card transactions initiated by AGENTS. T and T Consult Me have given the AGENTS the authority to charge customers credit cards under their merchant account and bind their company to those transactions.

18.      The defendant's forum related activities are unsolicited telemarketing calls to a California resident, the natural invasion of privacy harm of those calls would not have happened but for the calls to California.

3

19. The defendant's forum related activities are debt relief services calls to a California resident, the natural invasion of privacy harm of those calls would not have happened but for the calls to California

20. KRAKOW is the disclosed AGENT for an undisclosed PRINCIPAL. Thus, when an agent acts on behalf of a partially disclosed principal, the principal and the third party will be liable on contracts the agent makes, and the agent will also generally be liable unless otherwise agreed. T and T and Consult Me sent money somewhere and KRAKOW is the common person who appears to be in charge of where the money is sent as detailed in this complaint. KRAKOW through his Principal regularly conduct and have transacted business with PLAINTIFF in this state.

21. KRAKOW could seek a windfall in the form of having this case moved to a different jurisdiction because

TCPA Background

22. TCPA Background In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy [.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

23. The national Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. See 47 C.F.R. § 64.1200(c)(2). A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is

removed by the database administrator." Id.

24.    The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry.  47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2).

25.    A person whose number is on the Registry, and who has received more than one telephone call within any twelve-month period by or on behalf of the same entity in violation of the TCPA, can sue the violator and seek statutory damages.  47 U.S.C. § 227(c)(5).

26.    The regulations exempt from liability a caller who has obtained the subscriber's signed, written agreement to receive telephone solicitations from the caller. 47 C.F.R. § 64.1200(c)(2)(ii). That agreement must also include the telephone number to which the calls may be placed. Id.

27.    In Sengenberger v. Credit Control Services, Inc[2]., the court held that "intentionally" making phone calls that violated the TCPA was sufficient to warrant treble damages because "although neither the TCPA nor the FCC regulations define the terms 'willfully or knowingly'...courts have generally interpreted willfulness to imply only that an action was intentional. Further, Sengenberger noted that while the TCPA does not define willful, the Communications Act of 1943, of which the TCPA is a part, defines willful as "the conscious or deliberate commission or omission of such act, irrespective of any intent to violate any provision[ ], rule or regulation."

28.    A corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. E.g., Jack on Five Star Catering, Inc. . Season, Case No. 10- 10010, 2013 US. Disk LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) [M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct,

[2] SENGENBERGER v. CREDIT CONTROL SERVICES, INC. (N.D.Ill. 5-5-2010)

personal participation in or personally authorized the conduct found to have violated the statute. (internal quotation marks omitted)); Maryland v. Universal Elections, 787 F. Supp. 2d 408, 415 - 16 (D. Md. 2011) ( If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

Factual Allegations

29.     Plaintiff MARK AUSSIEKER's phone number ending in 8006 is a cellular phone.

30.     Plaintiff MARK AUSSIEKER's phone number ending in 8006 was added to the Do Not Call list in February 2003. See Exhibit A.

31.     Plaintiff has maintained the same cell phone ending in 8006 continuously since 2002.

32.     PLAINTIFF does not have a "landline" and primarily uses his cell phone as his home phone. He is a residential subscriber. He pays the phone bill with personal funds. He mainly uses his phone to communicate with friends and family.

33.     Plaintiff compiled a list of the calls placed to his cell and attaches them as Exhibit B

34.     Defendant KRAKOW willfully accepts leads from the Debt Relief Department, hereinafter DRD that are generated through illegal telemarketing because these leads benefit Defendant KRAKOW financially.

35.     Defendant KRAKOW approves and ratifies DRD's behavior for violating the TCPA because it benefits Defendant KRAKOW  financially.

36.     Defendant KRAKOW approves of the contracts with DRD .

37.     Defendant KRAKOW authorizes the payments to DRD .

38.        Defendants KRAKOW pays DRD out of bank accounts that he controls.

39.        Defendant KRAKOW is well aware that the unauthorized phone calls being made on their behalf by DRD soliciting Defendant KRAKOW 's debt relief services violate the TCPA. He either knew or consciously avoided knowing that DRD was calling people up and soliciting clients by telling them that DRD had been monitoring the credit lines. A reasonable person would have investigated this marketing practice. KRAKOW either knew or consciously avoided knowing that DRD would lie about sending mail to potential customers. Sepcifically, DRD was making a unilateral claim that Plaintiff's debt could be eliminated without actually knowing the financial situation of the Plaintiff. A reasonable person would have investigated this marketing practice. KRAKOW either knew or consciously avoided knowing that DRD would surreptitiously use the 1st four digits of the credit card to find out who the issuing bank it. Thereafter, they would call customer service number of that issuing bank and impersonate the customer to learn of the balance. This can be achieved through spoofing the telephone number to the customer which will bypass security prompts.

40.        Defendant KRAKOW tells DRD the name of the "Banking officer" who will accept the leads and then accepts the leads once they are transferred to KRAKOW.

41.        A reasonable investigation would have shown how DRD was generating clients for Defendant KRAKOW. KRAKOW ratifies DRD 's illegal telemarketing behavior because it benefits Defendant KRAKOW financially. The calls DRD made to Plaintiff on behalf of Defendant KRAKOW were not made to Plaintiff directly and could have reached anyone in the United States. DRD made at least eight harassing calls to Plaintiff calling on behalf of Defendant RAKOW before Plaintiff was able to identify the company DRD was calling on behalf of.

42.     Plaintiff has never had an established business relationship with Defendant KRAKOW and never knew who Defendant KRAKOW was prior to the calls.

43.     Upon information and belief Plaintiff has received additional calls within the past year from DRD calling on behalf of Defendant KRAKOW soliciting debt relief services that are unknown to Plaintiff at this time but will be revealed during discovery.

44.     Call#8 10/10/2023 14:43 - Plaintiff received one of multiple calls from DRD calling on behalf of Defendant KRAKOW from phone number 212-331-2992

45.     Plaintiff answered and was connected to a male telemarketer with a thick overseas accent.

46.     The male telemarketer advised Plaintiff he was calling from "debt relief department" and inquired if PLAINITIFF had received the mailer that his company delivered to his doorstep informing him that the banks and credit card company have been monitoring PLAINTIFF's profile for the last 6 months and that he qualified for debt elimination. The caller said he could eliminate the entire credit card debt.

47.     During this call, DRD took PLAINTIFF's credit card number and confirmed that it was through Chase. DRD asked PLAINTIF to hold and said he was going to check the balance. Upon information and belief, DRD called the issuing bank (Chase) and used the IVR or "interactive voice response" to impersonate PLAINTIFF and learn of PLAINTIFF's credit card balance.

48.     A fee was discussed and that PLAINTIFF would not have to pay the fee because the charge would be made to PLAINITIFF's credit card and he would not have to pay the credit card back.

49.     The caller does not actually eliminate the debt but instead will transfer the call to

8

1    Mr. KRAKOW to have him perform those services.

2    50.        Plaintiff was extremely annoyed and aggravated for continuing to receive calls

3    from telemarketers saying they are from "debt relief department" soliciting debt relief

4    services and advised the male telemarketer he was interested in the "debt relief program" or

5    "THE PROGRAM" for the sole purpose of identifying the company DRD  was calling on

6    behalf and stopping the company from continuing to solicit debt relief services under the

7    guise that PLAINTIFF was qualified to receive debt relief services.

8

9    51.        THE PROGRAM is a coordinated marketing campaign between KRAKOW and

10   DRD that allows DRD to solicit customers for KRAKOW and explain the business process

11   that KRAKOW follows to eliminate debt.

12   52.        The male telemarketer collected Plaintiff's credit card debt, and solicited Plaintiff

13   for debt relief services on behalf of Defendant KRAKOW .

14

15   53.        The male telemarketer then advised he was going to transfer Plaintiff to his

16   "verification department."  The call was transferred to another gentleman with a thick

17   overseas accent who identified himself as Albert Smith, the senior advisor for the debt relief

18   department verified Plaintiffs information.

19

20   54.        The verification department recorded the call along with certain statements like if

21   PLAINTIFF knows that credit score will go down.

22   55.        KRAKOW gets copies of the recording in the event that the call that is

23   transferred does not meet standards that KRAKOW sets.

24

25   56.        After speaking with the verification department, PLAINTIFF was told that the

26   banking officer would call back to finish up the enrollment.

27   57.        Defendant KRAKOW  instructs DRD  to say they are submitting the file  the to

28

9

the "Banking officer" and "Robin will call you back" in order to hide Defendant KRAKOW's true identity and duck liability for violating the TCPA, instead of advising the called party they are being transferred to a representative from Defendant KRAKOW. The result is that the customer is tricked into believing that ROBIN works for DRD when in fact it is a separate company.

58.    Plaintiff was told that he needed to speak with Robin in the banking department to finish up the enrollment. The transfer did not go through because the "banking officer" was busy and then was told that the "Banking officer" would call back. PLAINTIFF received a call on 10/10/2023 at 15:18 from 321-460-3010 where the caller identified herself as ROBIN MEADOWS .

59.    ROBIN MEADOWS was also identified as the "Program manager" in an unrelated case see Callier v Credit Mount[3] that alleged unsolicited calls pitching debt relief.

60.    MEADOWS called back and thus confirmed that Defendant KRAKOW  hires and authorizes DRD  to make illegal telemarketing calls to consumers soliciting debt relief services on behalf of Defendant KRAKOW .

61.    MEADOWS answered the call and confirmed that PLAINTIFF had just been speaking to "her qualifications team".

62.    ROBIN said she wanted to make sure that DRD explained that the PROGRAM correctly instead of truthfully saying that KRAKOW will not accept leads that do not conform to standards supplied to DRD.

63.    DEFENDANT KRAKOW tasks DRD with informing PLAINTIFF that the PROGRAM will make PLAINTIFFS credit score drop and that people who maintain bank accounts with a sponsoring card brands are ineligible for the PROGRAM.  The truth is that

---

[3] Case 3:23-cv-00030-FM UNITED STATES DISTRICT COURT WESTERN DISTRICT OF TEXAS EL PASO DIVISION ecf #1 page 7-8 Paragraph 46

64.     DEFENDANT KRAKOW controls DRD by not accepting leads that do not conform with the standards set out above.

65.     MEADOWS advised Plaintiff that Defendant KRAKOW will eliminate all of Plaintiff's personal debt if Plaintiff stops paying the debt.

66.     MEADOWS confirmed Plaintiff's personal debt amount and solicited Plaintiff for a debt elimination program on behalf of Defendant KRAKOW .

67.     MEADOWS advised Plaintiff to stop paying his creditors directly and let Defendant KRAKOW takeover. Meadows told PLAINTIFF to take credit card statements and throw into garbage.

68.     If Plaintiff would have enrolled into the debt consolidation program from Defendant KRAKOW ,it would benefit Defendant KRAKOW  financially.

69.     The 8 calls between 8/22/23-and 10/10/23 @ 14:43 were calls made to pitch PLAINTIFF debt relief services and the caller said that credit card debt would be eliminated for a  fee paid by PLAINTIFFS card brand that would be collected from PLAINTIFFS card brand, but PLAINTIFF would not have to pay the fee back because the credit card debt would be wiped out, leaving the card brand responsible.

70.     ROBIN said that she was going to charge the credit card $3800 to pay for the debt relief services. She again advised that PLAINTIFF would save money by not having to make monthly payment and that his credit score would go down, She informed Plaintiff that he could ignore statements and either confirmed OR may have eluded to the fact that they have lawyers who handle everything.

71.     ROBIN MEADOWS  said PLAINTIFF was getting this offer because he was being overcharged in interest and the money he sent in every month should cover the balance

11

he owed.

72.     PLAINTIFF believes these statements would qualify as "debt relief services" pursuant to Ca Civil code 1788.301 (a) because KRAKOW is acting for compensation because he collects a fee, in order to act or on behalf of PLAINTFF or as an intermediary, for the primary purpose to obtain a settlement for less than the full amount of the debt. Specifically, this representation was made when PLAINTIFF was told that he would not need to pay back his credit card for the fee that KRAKOW charged.

73.     Robin confirmed that she knew PLAITNFF was a California resident because she confirmed his address and engaged in small talk which revealed that ROBIN never traveled to California.

74.     ROBIN MEADOWS provided advice, by offering to act or acting as an intermediary, including, but not limited to, offering debt negotiation, debt reduction, or debt relief services between PLAINTIFF and Chase Visa who is a creditor of PLAINTIFF , for the primary purpose of that advice or action is to obtain a settlement for less than the full amount of the debt because ROBIN said PLAINTIFF would save money by not making payments towards Chase Visa and thus his debt would be eliminated.

75.     After which, Robin did a conference call with Chase VISA which Chase recorded.  PLAINTIFF was placed on hold and a representative from CHASE came onto the line and asked whom he was speaking to. It appears that ROBIN contacted CHASE and entered PLAINTIFF's credit card number and navigated the security prompts to get a live person without PLAINTIFF's assistance. During the recording, Robin said something to the effect that she was going to process one charge for $2000 and another of $1800. PLAINTIFF later found two charges on his credit card from two companies.  At no time did PLAINTIFF speak with anyone from CONSULTME or T&T Trucking.

76.     After Plaintiff observed a charge on his credit card by T & T TRUCK

SERVICES, LLC, Chase informed him that T&T was located in Delray Florida.  PLAINTIFF

was able to identify the same company through the Florida Secretary of State records which

gave Tiffany Mulero as a member manager. After a little bit of Googling PLAINTIFF found a

phone number for Tiffany Mulero and called her from 916-290-9144 to investigate the charge

on his credit card which appeared as T & T TRUCK SERVICES, LLC. PLAINTIFF told

Tiffany the purpose of this call was that he was looking for more information about the charge

that was on his credit card.  Tiffany immediately knew that charge was about debt relief

services and asked him to hold the line. While on the phone with Tiffany, at 8:14am,

plaintiff's cellphone rang (916-705-8006) and the caller id displayed 301-300-7987.

PLAINTIFF did not answer the call because he was speaking to Tiffany.  PLAINTIFF

continued to ask about the charge and asking where she sent the money.  Tiffany did not tell

PLAINTIFF where she sent the money, instead she asked PLAINTIFF to contact the people

that charged his credit card.  PLAINTIFF told her that the charge appeared to be from T & T

TRUCK SERVICES, LLC, so he thought he would ask her since it was her company.  Again,

TIFFANY asked PLAINTIFF to hold. After a period of silence, PLAINTIFF saw another call

come through to 916-290-9144 and the caller id displayed 301-300-7987.  PLAINTIFF again

did not answer and Tiffany never came back on to the call.

77.     Later that morning, (10/11/23) Robin called PLAINTIFF and told him that she

got a message that he called Tiffany of T&T TRUCK SERVICES.  Robin said she was

confused about why PLAINTIFF was calling the merchants.  PLAINTIFF said that he wanted

to know where T & T TRUCK SERVICES, LLC would send the money.  Robin was asked the

name of her company on her paycheck and she said it read "Hourly".  Robin said she would

have her supervisor call because that information "is above my paygrade". PLAINTIFF got a

13

call from 301-300-7987 where the caller identified himself as Lawrence. Lawrence explained that they had a lot of business and needed other merchants to handle the volume. He said T & T TRUCK SERVICES, LLC would send the money to Corporate One (but declined to put that in writing).   After Lawrence called, PLAINTIFF received another call from "Mr. Paul" who said he was in charge of quality assurance. PLAINTIFF believe he said something about having too much business and needed to pass if off to other companies to handle the charges but was not willing to provide a name. "Mr. Paul" also was not willing to explain how this was not credit card laundering, but said that T & T TRUCK SERVICES was not responsible because they give the money the financial team that gets the work done.   At the end of the call, Paul said that T and T was essentially his business, but the information with the secretary of state does not show him to be a member manager.

78.      PLAINTIFF requested an internal do not call policy from ROBIN, LAWRENCE and SAMUEL via a letter mailed to SAMUEL and LAWRENCE and verbally with ROBIN and again via text message on 1/11/24. A copy was never provided a copy and thus denied him the opportunity to identify the entity behind the calls.  A caller must provide a policy per 47 CFR 64.1200(d) and thus the failure to provide is a failure to follow the TCPA.

79.      An additional 4 Calls were made subsequently in order to process the sale and to ask why PLAINTIFF contacted the company that ran his credit card. The name of the entity was not given.  The 1st 8 calls violated 47 CFR 64.1200(c) because they were made to a number on the do not call registry. The 4 subsequent calls violated 47 CFR 64.1200(d) because the caller failed to adequately identify themselves, the company also lacks any sort of written do not call policy.

14

80.    It is believed that "Mr. Paul" is Samuel Krakow and is somehow related to Lawrence Krakow.

81.    The Telemarketing Sales Rule which prohibits "abusive" telemarketing conduct4.

82.    T and T and ConsultMe have given the marketers the authority to charge customers credit cards under their merchant account and bind their company to those transactions. The AGENTS acting through ROBIN MEADOWS have actual authority to use T & T and ConsultMe's merchant account therefore T & T and Consult Me are bound by the marketers' actions. See RESTATEMENT (SECOND) OF AGENCY " 144, 186 (1958); RESTATEMENT (THIRD) OF AGENCY " 6.01-6.03 (2006).

83.    An agency relationship is believed to exist when T & T granted authority to the AGENTS through ROBIN MEADOWS to bind their company to transactions ordered under their merchant accounts. T & T has failed to identify the people that allowed access to their merchant account.

84.    The underlying transaction which T and T and ConsultMe have been bound to are unsolicited telephone calls pitching debt relief services.

85.    The underlying transaction which T and T and ConsultMe have been bound to are "PAYMENT PROCESSORS" because they perform "PAYMENT PROCESSING SERVICES" as contemplated under Cal. Civ. Code § 1788.301 (i) which states "Payment processing services" means accepting, maintaining, holding, or distributing funds, or facilitating the acceptance, maintenance, holding, or distribution of funds, on behalf of a consumer for the purpose of facilitating debt settlement services." T and T and ConsultMe

---

4 The TSR specifically defines "abusive" conduct to include:  telemarketers failing and refusing to adequately identify themselves, thus forcing the consumer to do what it takes to identify them himself or herself. See Section 310.4(b)(1)(ii) of the TSR - "abusive" conduct includes: "requiring the person to identify the seller making the call or on whose behalf the call is made"

accept money for the purpose of paying the fee to perform debt settlement services.

86.     T and T and ConsultMe is required to follow THE FAIR DEBT SETTLEMENT PRACTICES ACT  because Cal. Civ. Code § 1788.305 (a) A debt settlement provider and a payment processor shall comply with this title.  T and T and ConsultMe are a payment processor and thus they are required to follow the act by because T and T and ConsultMe accepted funds  for the purpose of facilitating debt settlement services.

87.     An agency relationship is believed to have formed when Consult Me granted authority to the AGENTS  through ROBIN MEADOWS to bind their company to transactions ordered under their merchant account. Consult Me has failed to identify the people that he allowed access to his merchant account.

88.     All calls were willful and knowingly sent because the calls were sent to pitch debt relief services and the DEFENDANTs are in the business of providing those services or accepting payment for those services.

89.     Defendant's calls constituted calls that were not for emergency purposes as defined by 47 U.S.C. § 227(b)(1)(A).

90.     During all relevant times, Defendant did not possess Plaintiff's "prior express consent" to receive calls using an automatic telephone dialing  pursuant to 47 U.S.C. § 227(b)(1)(A).  The calls are impersonal advertisements: they do not address Plaintiff personally and they are only meant to generate calls to Defendant business.

91.     Plaintiff declares that he has never heard of Defendant T & T or Defendant Consult Me or, visited any location operated by either Defendant prior to the harassing and annoying calls, nor provided his cellular telephone numbers to said Defendants or consented to receive calls from Defendant. Plaintiff also has had no prior business relationship with Defendant. Plaintiff had no reason to be in contact with Defendants, nor had he previously

1    purchased any kind of product or service

2    92.        Such calls constitute solicitation calls pursuant to 47 C.F.R. § 64.1200(c)(2) as

3    they were attempts to promote or sell Defendant's service of debt relief services

4
5    93.        The only requirement to enforce the TCPA is to identify of the party responsible

6    for the calls.

7    94.        Mr. Aussieker's concrete injury as it relates to the Spokeo decision is loss of

8    productivity for answering the call, decreased battery life, the nuisance of receiving a seeing

9    that someone is calling and having them hang up before plaintiff could answer, defendants

10   bothering him with unrequested solicitations. Mr. Aussieker's concrete injury as it relates to

11   debt relief services is that he was pitched with the claim that he qualified for debt elimination

12   when in fact there was no factual basis for that claim.  PLAINTIFF "suffered injury in

13   precisely the form the statute was intended to guard against" (DRD and MEADOWS perfom

14   debt relief services without complying with state law).

15

16   95.        Mr. Aussieker did not welcome these calls.

17   96.        Defendant's calls harmed the Plaintiff by causing the very harm that Congress

18   sought to prevent- a nuisance and invasion of privacy.

19
20
21
22                           **Agency Liabilty**

23   97.        In the Matter of Rules & Regulations Implementing the Tel. Consumer

24   Prot. Act of 1991, 27 FCC Red. 1830, 1844 33 (2012) (footnote and internal quotation

25   marks omitted). FCC regulations "generally establish that the party on whose behalf a

26   solicitation is made bears ultimate responsibility for any violations." In the Matter of

27   Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991, 10 FCC

28

                                    17

Red. 12391, 123971 13 (1995).

98.     The FCC confirmed this principle in 2013, when it explained that "a seller ... may beheld vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers. (In the Matter of the Joint Petition Filed by Dish Network, LLC, 28FCC Red. 6574, 6574 1 (2013).

99.     In the Matter of the Joint Petition Filed by Dish Network, LLC, 28 FCC Red. 6574, 6574 (2013) Paragraph 28 "In this regard, we explain below that a seller may be liable for violations by its representatives under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification. Quoting from Henderson v. United Student Aid Funds, Inc., 918 F.3d 1068, 1073-1074, 2019"

The second way a principal can ratify the acts of a third party is through "willful ignorance." Under the "willful ignorance" theory, the principal may not know the material facts, but has "ratified with awareness that such knowledge was lacking." Restatement § 4.01 cmt. b. In effect, the principal can ratify the act of a third party—thereby making the third party the principal's agent—even if it does not know all the material facts, but it must be aware that it does not know the material facts and ratify anyway. "

100.     When PLAINTIFF complained to T and T Trucking about the unsolicited calls and the credit card charge, Tiffany Mulero who is the member manager of T&T referred PLAINTIFF to Lawrence Krakow.  This is indicative that T and T Trucking knew the material facts that Lawrence Krakow was initiating credit card charges under their merchant account.

101.     Upon information and belief, Lawrene Krakow accepted the benefits of using T and T Trucking merchant account under and directing charges to be made under that account.

18

102.     Upon information and belief, T and T Trucking set up a merchant account and had it classified as office supplies because the charge category on Plaintiffs receipt indicated that the charge was for office supplies.

103.     The manner in which DRD and ROBIN MEADOWS sold services allowed them to accept payment in order to hide the identities of DRD and KRAKOW.

104.     ON 10/10/2023 at 3:41PM, PLAINTIFFS credit card company texted PLAINTIFF that it had declined a charge from CONSULT ME, which would have notified CONSULT Me because they initiated the charge.

105.     ROBIN said that declines almost always happen because the charge amounts are atypical for the usual charge pattern and which is why she said that she needed to have PLAINTIFF do a conference call with the Chase Credit Card so PLAINTIFF could approve of the charges.

106.     It is plausible that there were other decline charges that T and T either knew about or could have known about.

107.     VISA warns merchants about excessive declines or chargebacks. A reasonable person would have investigated routine declines.

108.     Seeing repeated chargebacks at a minimum would give CONSULT Me or T&T " knowledge of facts that would have led a reasonable person to investigate further" because CONSULT Me or T&T knew that they did not make sales through their own sales channel and should have been notified of the declined charges under their account.

19

1

FORMAL AGENCY

2    109.    Actual authority is limited to actions "specifically mentioned to be done

3    in a written or oral communication" or "consistent with" a principal's "general

4    statement of what the agent is supposed to do." _Salyers,_ 871 F.3d at

5    940 (quoting _NLRB v. Dist. Council of Iron Workers of the State of Cal. and_

6

7    _Vicinity,_ 124 F.3d 1094, 1098 (9th Cir. 1997)).

8    110.    It appears that CONSULT Me or T&T gave absolute control for the

9    generating of sales to their AGENTS.  This is sufficient to show an agency

10   relationship because CONSULT Me or T&T gave permission to his AGENTS to

11   generate sales under CONSULT Me or T&T and the AGENTS were making sales for

12   KRAKOW.

13

14   111.    Implied actual authority comes from a general statement of what the agent

15   is supposed to do; an agent is said to have the implied authority to do acts consistent

16   with that direction. Hawaiian Paradise Park Corp. v. Friendly Broadcasting Co., 414

17   F.2d 750, 755 (9th Cir. 1969)

18   112.    Apparent authority arises from the principal's manifestations to a third

19   party that supplies a reasonable basis for that party to believe that the principal has

20   authorized the alleged agent to do the act in question. NLRB v. Donkin's Inn, 532 F.2d

21   138, 141 (9th Cir. 1976), cert. denied, 429 U.S. 895 (1976). If the District Council

22   (principal) supplied a reasonable basis for Coker (third party) to believe that it had

23   authorized Sorensen (agent) to modify the Standard Agreement, no ratification would

24   be required. Nat'l Labor Relations Bd. v. District Council of Iron Workers of

25   California & Vicinity, 124 F.3d 1094, 1099 (9th Cir. 1997)  In PLAINTIFFS view,

26   CONSULT Me or T&T supplied PLAINTIFF a reasonable basis to believe that the

27

28

1   AGENT (ROBIN MEADOWS) who charged the credit card was authorized to operate

2   on behalf of CONSULT Me or T&T because of the AGENTS access and ability to

3   charge PLAINTIFFS credit card on behalf of CONSULT Me or T&T. Specifically,

4   ROBIN was able to charge for CONSULT Me and T&T during the phone call

5   indicating that she was processing the charge for both companies. It also appeared that

6   CONSULT Me and T&T allowed ROBIN to decided how much to charge on each

7   account.   When TIFFANY of T&T referred PLAINTIFF to call Lawrence, she

8   ratified MR. KRAKOW's charging of PLAINTIFFS credit card. The phone number

9   on CONSULT Me credit card statement goes to Mr. Krakow, which is also ratifying

10   MR. KRAKOW's actions.

### Agency Liabilty

113.       In the Matter of Rules & Regulations Implementing the Tel. Consumer

Prot. Act of 1991, 27 FCC Red. 1830, 1844 33 (2012) (footnote and internal quotation

marks omitted). FCC regulations "generally establish that the party on whose behalf a

solicitation is made bears ultimate responsibility for any violations." In the Matter of

Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991, 10 FCC

Red. 12391, 123971 13 (1995).

114.       It appears that KRAKOW has  "both the right: (1) to assign the agent's task; and

(2) to control the means and details of the process by which the agent will accomplish that

task because when ROBIN first came onto the line, she wanted to verify that DRD had

followed a script of areas that need to be covered.  It also believed that Mr. Krakow instructs

Debt Relief Department to transfer calls to ROBIN  that match a certain credit card balance,

and instructs DRD to inform potential customers that their credit score will be impacted along

21

with the requirement that the customers need to be screened to make sure that a card holder does not maintain a checking account with an issuing bank.

115.    A showing of agency will almost definitely suffice for 'on behalf of', however no circuit court has yet ruled on the full extent of 'on behalf of' liability for DNC violations

116.    The TCPA statute itself assigns DNC liability for any two calls "by or on behalf of the same entity" within one calendar year.  47 USC 227(c)(5).   The other place the TCPA statute uses 'on behalf of' language is junk faxing, and it is detailed in the CFR as being much broader than agency liability.  47 CFR 64.1200(f)(10-11).  A few circuit courts have confirmed that on behalf of liability for junk faxing is considerably broader than mere agency. Palm Beach Golf Center v. Sarris (11th Cir.), Imhoff Investment v. Alfocino (6th Cir.), City Select v. David Randall Assocs (3rd Cir.), Bridgeview Health v. Clark (7th Cir.).

117.    It is possible that KRAKOW is liable for the calls under an agency theory and using "on behalf of" taken from the junk faxes.

## CREDIT CARD LAUNDERING

118.    In order to accept credit card payments from consumers, a merchant must establish a merchant account with a merchant acquiring bank or "acquirer." A merchant account is a type of account that allows businesses to process consumer purchases by credit or debit cards.

119.    Acquirers enter into contracts with entities known as payment processors that manage the bank's merchant processing program. Payment processors in turn frequently enter contracts with multiple "independent sales organizations" ("ISOs") to sign up merchants for merchant accounts with the acquirer.

120.    The acquirer has access to the credit card associations ("card networks"), such as MasterCard and VISA. The card networks require all participants in their

22

networks, including the acquirers and their registered ISOs, to comply with detailed rules governing the use of the card networks. These rules include screening processes and underwriting standards for merchants, to ensure that they are legitimate, bona fide businesses, and to screen out merchants engaged in potentially fraudulent or illegal practices. The rules also prohibit credit card laundering, which is the practice of processing credit card transactions through another company's merchant account. See Generally FTC V Apex Capital Group UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA Case 2:18-cv-09573-JFW-JPR , Dkt 120, Filed 09/11/19

121.     Merchants that pose a heightened risk of fraud to the card networks may be subject to closer scrutiny or may be denied merchant accounts. For example, the ISO or acquirer may be concerned that the merchant is engaged in illegal activity or will generate excessive rates of transactions returned by consumers ("chargebacks").

122.     Consumers initiate "chargebacks" when they dispute credit card charges by contacting their "issuing bank," which is the bank that issued the credit card to the consumer. When a consumer successfully disputes the charge, the consumer's issuing bank credits the consumer's credit card for the disputed amount, and then recovers the chargeback amount from the acquirer (the merchant's bank). The acquirer, in turn, collects the chargeback amount from the merchant.

123.     In order to detect and prevent illegal, fraudulent, or unauthorized merchant activity, the card networks operate various chargeback monitoring and fraud monitoring programs. For example, if a merchant generates excessive levels of chargebacks that exceed the thresholds set under VISA's chargeback monitoring program, the merchant is subject to additional monitoring requirements and, in some

1    cases, penalties and termination.

2    124.    Credit card laundering is commonly used by fraudulent merchants who

3    cannot meet a bank's underwriting criteria or who cannot obtain merchant accounts

4
      under their own names (whether because of excessive chargebacks, complaints, or
5
      other signs of illegal activity).
6

7    125.    To assist acquirers, payment facilitators, and marketplaces with their risk

8    management obligations, Visa has developed the Payment Facilitator and Marketplace

9    Risk Guide to manage RISK.  Visa has classified a set of merchant types as "high-

10   brand risk" when accepting card absent payments, as these businesses present an

11   elevated risk to the payment system— specifically due to higher levels of disputes or

12
     brand/reputation risk [5].  Outbound Telemarketing is listed at Page 11[6]
13

14   126.    MCC or "merchant classification code" is the way VISA defines which

15   types of MERCHANTS pose an increased RISK. The **Merchant Category Code**

16   **(MCC)** is a four-digit number assigned to describe a merchant's primary

17   business. The MCC should reflect the primary type of business in which the Merchant

18   is engaged in[7]. VISA requires that the merchant use MCC that most accurately

19   describes the Merchant's business and proscribe that this is to be calculated from the
20
     business with the highest sales volume [8].
21

22   127.    ROBIN MEADOWS was previously associated as the "PROGRAM

23   MANAGER" for Credit Mount.  Credit Mount was sued by Brandon Callier for

24   alleged TCPA Violations. Credit Mount was also sued by their payment processor

25

26   ---
     [5] https://usa.visa.com/content/dam/VCOM/regional/na/us/partner-with-us/documents/visa-payment-facilitator-and-marketplace-risk-guide.pdf page 10
27   [6] Id, pg 11
     [7] https://usa.visa.com/content/dam/VCOM/download/merchants/visa-merchant-data-standards-manual.pdf page 15
28   [8] Id, pg 15

24

who alleged that Credit Mount had an unprecedented 100% chargeback rate.

Meaning that 100% of their charges were charged back to the processor[9].   Credit

Mount submitted an application and disclosed that they were in the business debt

counseling[10].   Credit Mount also complained that debt counseling was considered high

risk[11] and it was hard to find processing companies because there were few options

who take on high risk merchants[12] .

128.       PLAINTIFF is informed and believes that T AND T  obtained a merchant

account whereby the MCC was issued for "office supplies" because PLAINTIFF's

credit card statement indicated the charge was for office supplies. VISA has assigned

an  MCC of 7277 covers Counseling Services – Debt, Marriage, and Personal[13].

However, the charge appears to be for "Office supplies" which has an MCC of 5111.

It is alleged that getting a merchant account for an unrelated industry would

circumvent the risk parameters VISA set up which Credit Mount complained of.

129.       It is believed that T&T falsely represented that the majority of their sales

were Office supplies because they received an MCC for office supplies and thus

avoided the scrutiny and troubles that Mount Credit complained about that "High

Risk" merchants face.

130.       It is believed that CONSULTME failed to accurately classify their

business when they obtained a merchant account because Plaintiff did not see the

charge listed as counseling services on his statement.

---

[9] PayArc LLC v. Credit Mount Inc. (1:22-cv-02092) District Court, E.D. New York ecf #11 page 11, para 19
[10] Id, ecf #1 exhibit A
[11] Id, ecf #11 page 9, para 5
[12] Id, ecf #11 page 9, para 29
[13] https://usa.visa.com/content/dam/VCOM/download/merchants/visa-merchant-data-standards-manual.pdf page 15, pg 84

1

## CIVIL CONSPIRACY OF PAYMENT PROCESSING

2

131.        Plaintiff pleads alternative theories under which T&T and CONSULTME is

3

liable for the calls. A party seeking to establish a civil conspiracy "must show that each

4

member of the conspiracy acted in concert and came to a mutual understanding to accomplish

5

a common unlawful plan, and that one or more of them committed an overt act to further it. It

6

7

is not enough that the [conspirators] knew of an intended wrongful act, they must agree—

8

expressly or tacitly—to achieve it." AREI II Cases, 216 Cal. App. 4th 1004, 1022, 157 Cal.

9

Rptr. 3d 368, 382 (2013)

10

132.        Unlawful Plan-16 CFR § 310.3 - Deceptive telemarketing acts or practices. (c)

11

Credit card laundering. Except as expressly permitted by the applicable credit card system, it

12

is a deceptive telemarketing act or practice and a violation of this Rule for:  (1) A merchant to

13

present to or deposit into, or cause another to present to or deposit into, the credit card system

14

for payment, a credit card sales draft generated by a telemarketing transaction that is not the

15

16

result of a telemarketing credit card transaction between the cardholder and the merchant.

17

Here, Robin Meadows caused Plaintiff to be charged $3800 for debt relief services and the

18

charge came from two different merchants. The charge was a result of a telemarketing

19

transaction because ROBIN charged PLAINITFFS card after calling PLAINTIFF and ROBIN

20

also confirmed that PLAINTIFF had been speaking to her qualifications team in New York

21

which is indicative that there was not a face to face meeting given that PLAINTIFF was in

22

California at the time of charge. There is a prima facie case of credit card laundering because

23

both merchants ( T & T and CONSULTME) presented into the credit card system for

24

25

payment a credit card sales draft generated by a telemarketing transaction that was not the

26

result of a telemarketing credit card transaction between the cardholder and merchant.

27

133,        Overt Act-  T & T and CONSULTME obtained merchant accounts without

28

1

2

revealing that they were going to let another entity make charges or that MCC codes did not accurately represent the true business.

3

4

5

6

7

8

9

10

11

12

13

14

134.    Agreement- either tacit or express "It makes no difference that defendants control only means of payment, not the mechanics of transferring the material…In a commercial environment, distribution and payment are…like love and marriage – you can't have one without the other. If cards don't process payments, pirates don't deliver the booty." Perfect 10, Inc. v. Visa et al., 494 F.3d 788, 818 (9th Cir. 2007). Its is alleged that T&T and were both delivering payments to Krakow. The fact that Mr. Krakow called PLAINTIFF while on the phone complaining to T&T is indicative of that allegation. The fact that Mr. Krakows phone number is listed as the point of contact for the charge on CONSULTME's credit card receipt is also indicative that CONSULTME was transferring money to Mr. KRAKOW.

15

16

17

18

19

20

21

22

135.    Plaintiff complained to T&T about the unsolicited calls.    T&T thru its member manager Tiffany Mulero sought to have PLAINTIFF speak to Mr. Krakow about the calls and charge.  T&T would present or deposit into,  the credit card system for payment  a credit card sales draft generated by a telemarketing transaction that was not the result of a telemarketing credit card transaction between the cardholder and T&T.  The sale from would be from another entity that was involved in the telemarketing call.

23

24

25

26

27

28

136.    If  CONSULTME claims they were engaged in payment processing, PLAINTIFF infers that the payments were not expressly permitted by the applicable credit card system. It is a violation of VISA network rules to submit the sales transactions of other companies through your own merchant account without registering as a payment facilitator.  VISA rules under "Acquirer Requirements for

27

1   Contracting with Payment Facilitators 5.3.1.3" state that "Not allow its Payment

2   Facilitator to provide payment services to outbound telemarketers" .   Plaintiff infers

3   that CONSULTME's merchant account did not allow them to be a payment processor

4
    for "Outbound Telemarketers" and thus the payments were not expressly permitted by
5
    the credit card system.
6

7                              PERSONAL LIABILITY
        137.    The TCPA is part of the Communications Act. Under the TCPA, an
8
    individual may be personally liable under 47 U.S.C. § 217. This section provides the "the
9
    act, omission, or failure of any officer, agent, or other person acting for or employed by
10
11  any common carrier or user, acting within the scope of his employment, shall in every

12  case be also deemed to be the act, omission, or failure of such carrier or user as well as

13  that of the person."

14      138.    Here, ROBIN MEADOWS reached out to PLAINTIFF and failed to disclose

15  the name of the entity that sold him services.  A telemarketer must disclose under 47 CFR

16
    64.1200(d) (4) Identification of callers and telemarketers. A person or entity making
17
    ...any call for telemarketing purposes must provide the called party with the name of the
18
19  individual caller, the name of the person or entity on whose behalf the call is being made,

20  and a telephone number or address at which the person or entity may be contacted.

21  ROBIN failed to do so which is a failure on her part and there was direct participation and

22  involvement in the failure because she was the one who called PLAINTIFF to facilitate

23
    the charge going to CONSULT ME and T&T and did not disclose the entity behind the
24
    call. During this call, ROBIN knew PLAINTIFF was in California because she verified he
25
26  had a California address and also called a telephone number associated with that forum.

27

28

                                28

## COUNT 1

### Violation of the Telephone Consumer Protection Act, 47 U.S.C.

**§227(c)(5)** – Telemarketing Solicitations to National Do Not Call Registrants

139.    PLAINTIFF charges Count One against Consultme LLC, LAWRENCE KRAKOW, T & T TRUCK SERVICES, LLC.

140.    Plaintiff hereby incorporates, as if fully rewritten herein, all foregoing paragraphs.

141.    Defendants placed 8 telephone solicitations to the Plaintiff to encourage the purchase of debt relief services.

142.    Defendants placed 4 telemarketing calls to complete a sale of services without mandated safeguards.

143.    Defendant did so even though the Plaintiff previously listed his telephone on the national do not call registry. This is a violation of 47 C.F.R. §64.1200(c)(2).

144.    Defendants placed 12 telemarketing calls Defendant did so despite not training its personnel on the existence or use of any internal "do not call" list which is a violation of 47 C.F.R. §64.1200(c)(2).

145.    Defendant failed to adequately identify themselves. Defendant failed to do so despite 47 C.F.R. §64.1200(d)(4).

146.    Defendant failed to provide a copy of their internal do not call policy. Defendant failed to do so despite 47 C.F.R. §64.1200(d)(1).

147.    Accordingly, Plaintiff is entitled to an award of $500 in statutory damages for each violative telephone call pursuant to 47 U.S.C. § 227(c)(5). Defendant violated multiple regulations promulgated under 47 U.S.C. § 227(c)(5)(B).

148.    Plaintiff s entitled to an award of up to $1,500 in damages for each such

29

1  knowing or willful violation. 47 U.S.C. § 227(c)(5)(C).

2

3

4  **COUNT 2**

5  **Violation of the California Debt Settlement Providers Act CA Civil Code**

6  **§1788.305**

7  149.    PLAINTIFF charges Count TWO against Consultme LLC

8  150.    Plaintiff hereby incorporates, as if fully rewritten herein, all foregoing

9  paragraphs.

10  151.    Defendant CONSULTME provided payment processing services under CA Civil

11  Code 1788.301 (b)1 because they accepted funds to facilitate Debt Settlement Services

12  

13  152.    Cal. Civ. Code § 1788.302 ("(3) Beginning July 1, 2022, for a payment

14  processor, facilitating the distribution of payment of any fee or consideration for debt

15  settlement services before the requirements set forth in paragraph (2) have been met.")

16  paragraph (2) requires that a contract is signed between the debt settlement service provider

17  and the client.

18  153.    CONSULTME charged a credit card before a contract was given to PLAINTIFF

19  and thus violated the title.

20  

21  154.    Cal. Civ. Code § 1788.305 (b)(1)(A) Statutory damages in an amount to be

22  determined by the court of no less than one thousand dollars ($1,000) and no more than five

23  thousand dollars ($5,000) per violation of this title.

24  155.    Cal. Civ. Code § 1788.305 (b)(2) allows for injunctive relief.

25  156.    Accordingly, PLAINTIFFF is entitled to damages and asks for maximum

26  damages because of the conduct of CONSULTME in misrepresenting the nature of the charge

27  to hide their illicit behavior from the card brand.

28

157.     PLAINTIFFF asks for injunctive relief to prohibit Consultme LLC from

performing payment processing services to California residents because the business model of

debt elimination is achieved through strategic default at "no cost" to the client because the

program fee is paid through a credit card that will be enrolled in the debt relief. The statute

requires that a fee cannot be charged until the provider "has renegotiated, settled, reduced, or

otherwise altered the terms of at least one debt pursuant to a settlement agreement approved

and executed by the consumer." Cal. Civ. Code § 1788.302 (c)(2). Therefore, there is risk of

continuing harm because it is not feasible to offer no cost debt elimination services if the

payments are made only after the card brand has received a settlement.   The legislative intent

of the law is to provide essential guardrails for an industry too often characterized by

promises of relief that actually put already struggling Californians at risk of further financial

harm.  Given that CONSULTME or T&T refuse to identify the name of the entity where the

funds are being sent , there is little to no chance they will start offering contracts to consumers

unless they are ordered to.   CONSULTME or T&T also gave ROBIN MEADOWS access to

their merchant accounts and there is a risk of future harm because they let other people use

their account.  It is alleged that ROBIN is not an employee of CONSULT ME or T&T

because she called PLAINTIFF to verify reports that PLAINTIFF was contacting merchants

to find out where the merchants sent the money. Robin said that information was above her

paygrade and offered to have her supervisor call the plaintiff.  Mr. Krakow did follow up and

which indicates that Mr. Krakow was the supervisor of her company.   There is an inference

that if Robin worked for T&T or Consultme, she would not have referred the companies as

"The merchants" and would have addressed the situation differently

## **COUNT 3**

### **Violation of the California Debt Settlement Providers Act CA Civil Code**

### **§1788.305**

158.        PLAINTIFF charges Count THREE against T & T TRUCK SERVICES, LLC

159.        Plaintiff hereby incorporates, as if fully rewritten herein, all foregoing

paragraphs.

160.        Defendant T&T provided payment processing services under CA Civil Code

1788.301 (b)1 because they accepted funds to facilitate Debt Settlement Services

161.        Cal. Civ. Code § 1788.302 ("(3) Beginning July 1, 2022, for a payment

processor, facilitating the distribution of payment of any fee or consideration for debt

settlement services before the requirements set forth in paragraph (2) have been met.")

paragraph (2) requires that a contract is signed between the debt settlement service provider

and the client.

162.        T&T charged a credit card before a contract was given to PLAINTIFF and thus

violated the title.

163.        Cal. Civ. Code § 1788.305 (b)(1)(A) Statutory damages in an amount to be

determined by the court of no less than one thousand dollars ($1,000) and no more than five

thousand dollars ($5,000) per violation of this title.

164.        Cal. Civ. Code § 1788.305 (b)(2) allows for injunctive relief.

165.        Accordingly, PLAINTIFFF is entitled to damages

166.        Accordingly, PLAINTIFFF is entitled to damages and asks for maximum

damages because of the conduct of T &T  in misrepresenting the nature of the charge to hide

their illicit behavior from the card brand.

167.        PLAINTIFFF asks for injunctive relief to prohibit T & T TRUCK SERVICES,

LLC for same reasons stated in count 2.

## COUNT 4

### Violation of the California Debt Settlement Providers Act CA Civil Code

### §1788.305

168.    PLAINTIFF charges Count Four against KRAKOW and MEADOWS.

169.    Plaintiff hereby incorporates, as if fully rewritten herein, all foregoing paragraphs.

170.    Defendant KRAKOW and MEADOWS provided Debt Settlement Services as defined CA Civil Code 1788.301 (b)1.

171.    CA state law requires that a debt settlement provider provide a contract 3 days before charging a consumer. The contract must state in relevant part Cal. Civ. Code § 1788.302 (b)(1)

(A) There is no guarantee that any particular debt or all of the consumer's enrolled debts will be reduced, eliminated, or otherwise settled.

(C) If the consumer stops paying any creditor, any of the following may occur:

(i) The creditors may still try to collect.

(ii) The creditors may sue.

(iii) If a creditor obtains a judgment against the consumer, the creditor may garnish the consumer's wages or levy the consumer's bank account or accounts, or both garnish the consumer's wages and levy the consumer's bank account or accounts.

(E) Specific results cannot be predicted or guaranteed, and the debt settlement provider cannot require a creditor to negotiate or settle a debt.

(M) Whether the debt settlement provider pays or receives referral fees.

172.    DEFENDANTS failure to disclose the above enumerated items demonstrate a complete and total disregard of California law.

173.    KRAKOW And MEADOWS failed to comply with Cal. Civ. Code § 1788.302 (c)(2)- For a debt settlement provider requesting or receiving payment of any fee or consideration for debt settlement services, unless and until all of the following occur: They did so because they failed to provide a contract.

174.    Cal. Civ. Code § 1788.305 (b)(1)(A) Statutory damages in an amount to be determined by the court of no less than one thousand dollars ($1,000) and no more than five thousand dollars ($5,000) per violation of this title.

175.    Cal. Civ. Code § 1788.305 (b)(2) allows for injunctive relief.

176.    Accordingly, PLAINTIFF is entitled to damages and asks for maximum damages because of the conduct of KRAKOW in a complete failure to even try to follow the law. There was no contract, took payment before giving certain disclosures, refuses to identify the entity who actually performs the services.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgement as follows:

177.    For an order finding for PLAINTIFF on Count 2. An award of $5,000 against Consultme LLC for COUNT TWO and the injunctive relief requested against Consultme LLC.

178.    For an order finding for PLAINTIFF on Count 3. An award of $5,000 against T & T TRUCK SERVICES, LLC for COUNT THREE and the injunctive relief requested against T & T TRUCK SERVICES, LLC.

179. For an order finding for PLAINTIFF on Count 4 An award of $5,000 against LAWRENCE KRAKOW for COUNT FOUR and the injunctive relief requested against LAWRENCE KRAKOW.

180. For an order finding for PLAINTIFF on Count 4 An award of $5,000 against ROBIN MEADOWS for COUNT FOUR and the injunctive relief requested against ROBIN MEADOWS.

WHEREFORE, Plaintiff requests judgment against Consultmc LLC,  LAWRENCE KRAKOW, T & T TRUCK SERVICES, LLC, jointly and severally for the following:

181. For an order finding for the plaintiff on Count 1.

182. For an order finding the defendant knowingly and willfully violated TCPA

183. An award of $500 per call for the 12 calls which amounts to $6,000 in statutory damages as prescribed under 47 U.S.C. § 227(c)(5)(B).   This amount be tripled to $18,000 as prescribed under 47 U.S.C. § 227(c)(5)(C).

184. For an order finding TCPA intentional violations jointly and severally against the corporation and individual for the 12 calls.

185. Any other relief the court deems proper.

Respectfully Submitted this 12th January, 2024.

Certification and Closing Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my

35

1    case.
     Date of signing: 12th Day of January, 2024.
2    Signature of Plaintiff

3    _____
     Printed Name of Plaintiff _Mark Aussieker
4

5

6

7                                        EXHIBIT A
8

9    ← → C ⌂         🔥 🔒 https://mail.g    ••• ☑ ☆      ⬇ ⦀ ▭ ◎ ⌬ ≡
     🌐 Getting Started   ✪ Most Visited
10

     ▶ Gmail                              Mark Aussieker <aussieker1@gmail.com>
11

12   **National Do Not Call Registry - Your Registration Is Confirmed**
     1 message

13   **Verify@donotcall.gov** <Verify@donotcall.gov>          Wed, Feb 13, 2019 at 6:53 PM
     To: aussieker1@gmail.com
14
     Thank you for registering your phone number with the National Do Not Call Registry. You successfully
     registered your phone number ending in 8006 on June 28, 2003. Most telemarketers will be required to
15   stop calling you 31 days from your registration date.

     Visit https://www.donotcall.gov to register another number or file a complaint against someone violating
16   the Registry.

17   **********************************************************************************************************
     ******

18   Please do not reply to this message as it is from an unattended mailbox. Any replies to this email will not
     be responded to or forwarded. This service is used for outgoing emails only and cannot respond to
19   inquiries.

20

21

22

23

24

25

26

27                                       EXHIBIT B
28

                                           36

| Pacific Time | Caller ID | Caller ID Name | From Number |
|---|---|---|---|
| 8/22/2023 10:16 | 212-331-2992 | UNIVERSAL MUSIC | 212-331-2992 |
| 8/28/2023 14:45 | 212-333-1042 | UNIVERSAL MUSIC | 212-333-1042 |
| 9/1/2023 10:38 | 212-331-2977 | UNIVERSAL MUSIC | 212-331-2977 |
| 9/6/2023 9:04 | 212-331-2587 | UNIVERSAL MUSIC | 212-331-2587 |
| 9/18/2023 11:12 | 212-331-2983 | UNIVERSAL MUSIC | 212-331-2983 |
| 9/27/2023 15:08 | 212-331-2477 | UNIVERSAL MUSIC | 212-331-2477 |
| 10/5/2023 10:26 | 212-331-2488 | UNIVERSAL MUSIC | 212-331-2488 |
| 10/10/2023 14:43 | 212-333-1022 | UNIVERSAL MUSIC | 212-333-1022 |
| 10/10/2023 15:18 | 321-460-3010 | MEADOWS ROBIN | 321-460-3010 |
| 10/11/2023 8:14 | 301-300-7987 | KRAKOW,LAWRENCE | 301-300-7987 |
| 10/11/2023 8:44 | 321-460-3010 | MEADOWS ROBIN | 321-460-3010 |
| 10/11/2023 8:52 | 301-300-7987 | KRAKOW,LAWRENCE | 301-300-7987 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28